## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

JAMES FORD and BOBBY GRAHAM, | CASE NO. 3:21-cv-932

     Plaintiffs,

v.

MARK INCH in his Official Capacity and WARDEN JIMMY COKER, SGT. STEPHENS, OFCR JOYNER, and OFCR KING, and JOHN DOES 1-5, individually,

     Defendants.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### Introduction

Plaintiff James Ford, a vision-impaired inmate at Santa Rosa Correctional Institution in Milton, Florida, was attacked by predatory inmates who robbed and stabbed him. Corrections Ofcr. Joyner was present and spoke with two of the gang as they entered and watched them drag Mr. Ford from the dayroom to his cell and stab him several times, puncturing a lung and inflicting spinal injuries. Joyner would allow gang members to enter dormitories where they were not authorized so they could "fish" for vulnerable inmates and rob them. The gang members also attacked Ford's inmate ADA assistant, Bobby Graham. After the attackers left Ford bleeding on the floor, Ofcr. Joyner told a trainee in the Officer's Station to let the gang members out of the wing. The officers never summoned aid.

Plaintiffs sue Defendants and allege:

## **Jurisdiction and Venue**

1. Plaintiff's claim for relief is based on 42 U.S.C. § 1983, 1985, and state law claims. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

3. Plaintiff's claim is also based on Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and 12133, and § 504 of the Rehabilitation Act.

4. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202 and Fed.R.Civ.P. 57, and injunctive relief is authorized by Fed.R.Civ.P. 65.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as some of the events sued upon occurred in this judicial district.

6. All conditions precedent to this action have been performed or waived.

## **Parties**

7. At all times material, Plaintiff, JAMES TERRELL FORD and BOBBY GENE GRAHAM were prisoners in the Florida Department of Corrections (FDC) and FORD was a Qualified ADA Inmate with Multiple Disabilities.

8. At all times material, Defendant MARK INCH, in his Official Capacity, led a state agency charged with operating Florida prisons and caring for inmates. He is sued for injunctive relief and under the ADA and Rehabilitation Act.

9.  At all times material, Defendant JIMMY COKER was Warden at Santa Rosa C.I. He is sued individually.

10. At all times material, Defendant SGT. STEPHENS was an Officer at Santa Rosa C.I. He is sued individually.

11. At all times material, Defendant OFCR. JOYNER was an Officer at Santa Rosa C.I. He is sued individually.

12. At all times material, Defendant OFCR. KING was an Officer at Santa Rosa C.I. He is sued individually.

13. At all times material, Defendant JOHN DOES 1-3 are members of the Institutional Classification Team. They are sued individually.

14. At all times material, Defendant JOHN DOE 4 is a Santa Rosa staff person who organized the transfers of Ford. He is sued individually.

15. At all times material, Defendant JOHN DOE 5 is a FDC Central Office staff who ordered the transfers of Ford. He is sued individually.

16. Defendants acted under the color of law but outside the course and scope of their employment, pursuing private and criminal purposes, including an ongoing course of threats and retaliation against the Plaintiffs.

## Common Allegations of Fact

17. On the morning of July 31, 2017, inmate James Ford, who is sight-impaired, was attacked in L Dorm, Wing 1 by gang members from another wing.

18. Disabled prison inmates like Mr. Ford live tenuously in a hostile environment with predatory inmates who consider a disabled, vulnerable inmate with property as a "sweet lick" – an easy target for robbery.

19. Florida corrections officers sometimes act as accomplices to predatory inmates, giving them safe passage in and out of unassigned housing areas to rob and steal and exact punishments, collect debts and the like.

20. Florida prison inmates are not allowed to enter unassigned housing areas.

21. Florida prison inmates cannot roam from one housing area to another without officers specifically seeing them and unlocking doors for them.

22. Here, the gang members were allowed to enter by Ofcr. Joyner, with whom they spoke briefly, and allowed to leave again after the attack on Ford.

23. At first, the gang members sent a younger member to snatch Mr. Ford's gold chain but Mr. Ford surprised him by putting up a fight for his property.

24. Then the entire group rushed at Ford, breaking his jaw, stabbing him in both hands, his mouth, and four times in his back, puncturing a lung and causing a severe spinal injury that left him partially wheelchair dependent.

25. As Ofcr. Joyner watched, the attackers stabbed and beat Ford, cleaned up a pool of blood on the floor and left the wing with Ofcr. Joyner's help.

26. After the attack, Mr. Ford became aware that Bobby Graham, the ADA orderly who assisted him because of his disability, was also stabbed.

27. Ofcr. Joyner watched the attack but did nothing. None of the officers on the scene tried to intervene or call for help as the robbery took place.

28. Mr. Ford was bleeding heavily but he was able to walk with difficulty.

29. When Mr. Ford was able to get to the door of the housing area, he saw Ofcr. Joyner in the sallyport talking to two of the men who had just stabbed him.

30. Ofcr. Joyner made no effort to hide the fact that he was familiar with and on good terms with men who robbed and almost killed Ford in his Dorm.

31. Ofcr. Joyner was one of the officers who would sometimes let gang members go "fishing" in unassigned areas to rob vulnerable inmates.

32. Mr. Ford knew Ofcr. Joyner would not let him out to go to medical unless he made up a cover story about how the injury happened so Mr. Ford made it clear to Joyner that he would tell medical staff that he fell down the stairs.

33. Ofcr. Joyner told the trainee in the officer's station to give Ford a pass.

34. Mr. Ford made it as far as medical without help and passed out in the hall.

35. When Mr. Ford woke up, he was lying on an examination table and Capt. Andrew R. Parrott, OIC (Officer in Charge) was in the room.

36. Mr. Ford told Captain Parrott his ADA assistant had also been stabbed.

37. Mr. Ford was taken to Sacred Heart Hospital at around 4:00 p.m.

38. Mr. Ford remained at Sacred Heart for about a week with a punctured lung and internal bleeding and other serious injuries.

39. Capt. Parrott went to Dorm L-1, and found inmate Bobby Graham, Ford's

    inmate assistant, also bleeding, and took him to the medical department.

40. Mr. Graham was subsequently sent to Baptist Hospital for his injuries.

41. On September 6, 2017, Mr. Graham reported to investigators as follows:

    a) That Ofcr. Joyner had let 8-10 inmates from Dorm L, Wing 2, come into
       Wing 1 and stab and beat him and Mr. Ford and then let them out to go
       back to their own wing to hide their home-made weapons.

    b) That Sgt. Stephens had threatened Graham to the effect that if he wrote
       Ofcr. Joyner up, "I will kill you or hide you back here in confinement. I
       will deny you any [grievance forms], you fucking snitch."

    c) That Sgt. Stephens told him that James Ford was going to get transferred
       soon because his family keeps calling about him. (Ford was subsequently
       sent to Dade C.I., as far from his family in Jacksonville as possible.)

    d) That (at the time of his report) Graham had not been out of his cell for 33
       days, had not showered or shaved for fear of retaliatory attacks.

    e) That Sgt. Stephens said "I'm from Milton and we don't like niggers" and
       "We are going to put someone in [your cell] to fuck you up, you snitch."

    f) That Ofcr. King made similar threats to Graham and other inmates.

    g) That Mr. Graham tried to speak with the Institutional Classification Team
       (ICT) about the attack and threats against him when they did their rounds
       but the team members refused to talk to him.

    h) That Graham asked for review of dorm cameras for L Dorm, Wing 1,
       7/31/17 from 7:30 to 10:00 a.m., and C Dorm, Wing 3, on 8/25/17 from
       2:00 to 3:00 p.m., and 9/5/17, from 6:00 to 7:40 p.m.

42. Mr. Ford made a report that was received by the Florida Department of Law

    Enforcement on October 6, 2017, and subsequently turned back over to

    Florida Department of Corrections (FDC) investigators, reporting:

a) That he was stabbed 7 times by 7 inmates while Ofcr. Joyner watched;

b) That Joyner let his attackers back out after they finished stabbing him;

c) That FDC was bouncing him from camp to camp, keeping him away from family support and making it hard to file and receive paperwork.

43. FDC has a rule that inmates are not allowed to enter a housing unit where they are not assigned but in practice, inmates, and especially gang members, are able to make private arrangements with officers to violate the rule.

44. FDC makes this easier by implementing rules that impose no penalties on correctional officers who allow inmates into unauthorized housing areas.

45. Gang members reward corrections officers with small gifts like honeybuns or cheeseburgers or help them distribute contraband like cigarettes.

46. Mr. Ford identified three of his attackers: William "Willie" Delaford, from Quad 3; Benjamin Price from Quad 2, and an inmate Ford only knew by his prison nicknamed, "Hit Man." Only Price was mentioned in FDC reports.

47. Mr. Ford wanted his attackers and Ofcr. Joyner prosecuted but only Price was submitted to prosecutors. Joyner was scarcely mentioned in the reports.

48. There is no indication that Ofcr. Joyner's role was investigated at all.

49. FDC Procedures, inadequate as they are, were ignored in this case.

50. After Mr. Ford pressed his complaint with the help and support of his family, FDC staff moved Mr. Ford as far from his family as they could.

51. Mr. Ford's key witness, Bobby Graham, was threatened with death.

52. Before and since this incident, Defendants have cooperated to permit:

   a) officer-on-inmate assaults;

   b) officer-assisted inmate on inmate assaults;

   c) cover-ups involving failures to report and hiding evidence;

   d) failure to report or accurately report incident details;

   e) failure to timely download, review and report on video;

   f) Refusal to interview known witnesses to criminal activity;

   g) suppression of testimony of witnesses through intimidation;

   h) failure to document or preserve evidence and information;

   i) failure to punish abuses, false reports, or rule violations once discovered.

53. Defendants were aware their administrative and supervisory practices were substantially certain to cause the kind of harm suffered by Plaintiffs.

54. The Defendants' conduct herein, including but not limited to their decision to retain and protect corrupt officers and threaten witnesses to their constitutional abuses proximately caused the damages to Plaintiffs.

55. Defendants each acted to violate Plaintiffs' constitutional rights or failed to intervene to prevent the violation of their rights, though able.

56. Defendants acted collectively and jointly to violate Plaintiff's rights.

57. Defendants acted with specific intent to harm Plaintiffs and did so.

58. Defendants reached an implicit or explicit understanding and:

   a) Agreed to ignore the misconduct of the individual defendants;

b) Agreed to uphold the Code of Silence which among Florida prison officials is the meaning of the motto, "We Never Walk Alone."

c) Agreed to hide and destroy and alter evidence, to engage prisoners and others to help hide, destroy, and cover up evidence and remain silent;

d) Agreed to give false and misleading statements to investigators and continue misinformation for years after their criminal actions;

e) Failed to conduct a complete and honest investigation.

f) Punished Plaintiffs' efforts to speak the truth and seek redress of grievances through coordinated threats and retaliation.

59. In so doing, Defendants pursued their own, independent criminal interests which were inconsistent with the legitimate interests of their agency.

60. Plaintiffs' injuries were a direct and proximate result of Defendants collective and coordinated lawless acts under color of law.

## Causes of Action

### I. Failure to Protect under 42 U.S.C. § 1983 (Mark Inch, Injunctive Relief)

61. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

62. Plaintiff Ford is entitled to declaratory and injunctive relief against Defendant Inch in his official capacity, for systemic ongoing failure, through his agents and employees ("staff") to protect Plaintiff from threats and retaliation in violation of the First and Eighth Amendment to the U.S. Constitution, as set out in the Common Allegations of Fact.

63. Despite reform efforts by top leadership and honest professionals, mid-level corrections staff perpetuates a culture of corruption and violence as follows:

a. FDC has an informal custom to permit corrections officers to cooperate with gang members and other predatory inmates to enable criminal activities and allow them to move freely throughout the housing areas.

b. FDC has an informal custom to limit investigations and destroy or hide evidence to frustrate honest and complete investigation sustained by mid-level investigative staff despite any efforts of top leadership.

c. FDC has an informal custom to use threats of physical violence and actual physical violence by corrections staff and mercenary inmates to dissuade inmates from testifying truthfully about constitutional abuses.

d. FDC has an informal custom of labeling inmates who complain about corruption and abuse as "snitches" and subject them to retribution by gangs and predatory inmates who are invested in the culture of abuse.

e. FDC has an informal custom of calling ahead to institutions where troublesome inmates are transferred to ensure that the campaign of threats and violence continues from camp to camp.

f. FDC has an informal custom of ignoring severe racial prejudice among prison staff and has not made significant efforts to eliminate the effects of such prejudice or counter the encroachment of Klan activity among staff.

g. Plaintiff Graham has been threatened by Sgt. Stephens with death for telling the truth about the assault of himself and Plaintiff Ford.

h. Plaintiff Ford has been moved from prison to prison repeatedly to make it difficult for him to communicate with family and redress grievances.

i. Secretary Inch is aware of the problem of retaliation and has issued a sternly-worded memorandum on retaliation to corrections employees but has failed to take the necessary actions to enforce his commands.

j. The Uniform Commitment Order by which prisoners are committed to the Florida Department of Corrections orders the keepers of Florida prisoners to "safely keep" the prisoners and states, "Herein fail not."

64. Secretary Inch has a non-delegable duty to protect Florida prison inmates.

65. As a proximate result of denial of protection, Plaintiffs have suffered

irreparable harm, including physical injury, mental distress, humiliation, and will continue to suffer such injuries in the future unless relief is granted.

66. The ongoing threats and physical abuse and imposition of obstacles to redress is not mooted by transfers to successive institutions since the same kinds of abuses continue from camp to camp without abating.

67. Plaintiffs submit they have a strong chance of success and the relief sought is narrowly drawn and consistent with the public interest.

68. As it was necessary for Plaintiffs to retain the undersigned attorney to represent them, they are entitled to an award of attorneys' fees and costs. WHEREFORE, Plaintiff seeks relief as noted below.

## II. First Amendment Retaliation under 42 U.S.C. § 1983

69. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

70. Plaintiffs are entitled to relief against Defendants Coker, Stephens, Joyner, King, and John Does 1-5 and against Mark Inch for injunctive relief.

71. Plaintiffs communicated their right to rely in good faith on their First Amendment right to give, and not to rescind, their truthful account of the incident surrounding their attacks and stabbings at Santa Rosa C.I.

72. Plaintiffs were threatened with physical harm, including death.

73. Plaintiffs were intentionally retaliated against or punished because of their expressed intent to give truthful testimony as to the robbery and stabbings.

74. The Defendants herein share liability for retaliation, including threats, to Plaintiffs to the extent that the retaliation would likely deter persons of ordinary firmness from exercising their First Amendment rights.

75. As it was necessary for Plaintiffs to retain the undersigned attorney to represent him, Plaintiffs are entitled to an award of attorneys' fees and costs. WHEREFORE, Plaintiffs seek relief as noted below.

## III.  42 U.S.C. § 1983: Deliberate Indifference (Coker, Stephens, Does 1-5)

76. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

77. Plaintiffs are entitled to relief against Defendants Coker, Stephens, and Does 1-5, for deliberate indifference to violation of the Eighth Amendment.

78. Prior to July 31, 2017, aforementioned Defendants evinced deliberate indifference to constitutional rights of inmates, which ultimately caused the violation of Plaintiff's assault injuries and ongoing retaliation.

79. Prior to July 31, 2017, the Defendants were aware of their subordinate correctional officers' corrupt practices, threats, and retaliation.

80. Defendants maintained a practice of limiting and suppressing investigations of misconduct, altering, suppressing or destroying evidence or ordering others to do the same, and threats and retaliation against witnesses.

81. Defendants performed, caused, planned, or encouraged corrupt practices and made abuses, threats, and retaliation substantially certain to occur.

82. As a direct, proximate, and foreseeable result of the Defendants' deliberate indifference, Plaintiffs suffered serious injuries and great mental distress.

83. As Plaintiffs are obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, they are entitled to reasonable attorney fees as well as costs.

WHEREFORE, Plaintiffs seek damages as noted below.

IV. **Conspiracy to Interfere with Civil Rights under 42 U.S.C. 1985(2) (Defendants Stephens, Joyner, King, and John Does 1-5)**

84. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

85. Plaintiffs are entitled to relief against Defendants Stephens, Joyner, King, and John Does 1-5, for Conspiracy to Interfere with Civil Rights pursuant to 42 U.S.C. 1895(2) by intimidating witness Plaintiffs to prevent them from testifying freely, fully and truthfully, and injure them for having so testified.

86. Defendants each demonstrated their agreement to perform overt acts to further the conspiracy to deprive Plaintiffs of constitutional rights.

87. As a direct result of the conspiracy, Plaintiffs suffered severe injuries.

88. As Plaintiffs are obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, they are entitled to reasonable attorney fees as well as costs.

WHEREFORE, Plaintiffs seek damages as noted below.

V. **Violations of the ADA and Rehabilitation Act (Mark Inch)**

89. Plaintiff re-alleges the Common Allegations as if fully set forth herein.

90. Plaintiff Ford is entitled to relief against Mark Inch as Secretary of the FDC,

for violating Title II of the Americans with Disabilities Act (ADA) and

parallel provisions of § 504 of the Rehabilitation Act (RA).

91. 42 U.S.C. § 12101 et seq., ("ADA") provides in pertinent part:

No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

42 U.S.C. § 12132

92. Title II of the Act prohibits, among other things:

- limiting a qualified individual's enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service of an agency; and

- subjecting a qualified individual to discrimination under any program or activity conducted by an agency.

28 C.F.R. § 39.130.

93. Plaintiff Ford was disabled as defined at 42 U.S.C. § 12102(2), as he

suffered a physical impairment that substantially limited one or more of his

major life activities, including, but not limited to, visual impairment.

94. Mr. Ford was a "qualified individual" under 42 U.S.C. § 12131(2) which

means a person with a disability who meets essential eligibility requirements

for receipt of services or participation in programs or activities provided by

the entity (with or without regard to any auxiliary aids or modifications).

95. FDC is a state entity that has violated Title II of the ADA and the RA.

96. FDC is a state entity that receives federal funds.

14

97. Santa Rosa C.I. is an FDC facility and its operation comprises and includes programs and services for purposes of Title II of the ADA.

98. Defendant Inch authorized key agents and employees to act for FDC in the acts constituting ADA violations alleged herein. Defendant Inch's staff accepted the undertaking of acting on behalf of FDC when they committed the violations alleged. Defendant Inch had control over his agents and employees as they committed the ADA violations alleged herein.

99. The ADA violations alleged herein and committed by Defendant Inch's agents and employees were done while acting with grants of discretion and authority within the course and scope of their employment. Thus, Defendant Inch is vicariously liable for the actions of his agents and employees when they committed the ADA violations alleged herein.

100. Plaintiff's need for a reasonable accommodation was known and obvious.

101. Inmates with vision impairments require special protection in a violent and predatory environment, such as Santa Rosa C.I. because they lack some normal human resources for self-protection and self-defense.

102. Corrections staff was well aware of Mr. Ford's impairment and it is obvious in his physical appearance that he has a sight impairment.

103. Defendant FDC, its employees, and agents knew and/or should have known of Mr. Ford's need for a reasonable accommodation.

104. FDC, its agents and employees, acted intentionally and/or with deliberate indifference to Mr. Ford's need for a reasonable accommodation by:

    a.  permitting predatory inmates to prey on vulnerable disabled inmates;

    b.  failing to accommodate Plaintiff's disability by providing safe housing;

    c.  permitting practices whereby inmates with disabilities are punished based on animus toward or contempt for their disability;

    d.  failing and intentionally refusing to supervise and discipline Defendant FDC employees regarding the safe care of disabled inmates;

    e.  failing and intentionally refusing to maintain safe housing by failing to restrict roaming predatory gangs from unauthorized areas.

    f.  failing and intentionally refusing to allow abused vulnerable inmates to seek redress of grievances without threats and intimidation.

105. As a proximate result of defendant FDC, its employees', and agents' failure and intentional refusal to provide Mr. Ford with a reasonable accommodation for his disability, he suffered severe physical harm.

WHEREFORE, Plaintiff seeks damages as noted below.

**VI. Abuse or Neglect of a Vulnerable Adult § 415.1111, Fla.Stat.**

106. Plaintiff Ford is entitled to relief against Defendant Coker, Stephens, and Does 1-5 under the Adult Protective Services Act.

107. Plaintiff Ford met the definition of a "vulnerable adult" in that he was an adult whose ability to perform the normal activities of daily living or to provide for his own care was impaired due to a visual impairment.

108. The above Defendants assumed the responsibility for a caregiver

relationship, involving the regular and frequent care of Plaintiff, including feeding, housing, clothing, medical care and monitoring well-being.

109. Defendants had a duty to avoid acts or omissions that caused significant impairment to Plaintiff's mental and physical health.

110. Defendants had a duty to provide care, supervision and services necessary to Plaintiff, including housing safe from predatory inmates and gangs.

111. Defendants breached that duty of care by abusive and neglectful acts that could reasonably be expected to cause serious physical and mental injury.

112. Defendants breached their duties to Plaintiff in one or more of the following:

    a.  Acting in a way that caused or was likely to cause significant impairment to Plaintiff's physical, mental, and emotional health;

    b.  Failing to effectively monitor and protect vulnerable inmates;

    c.  As to Coker, failing to properly hire, supervise and discipline employees involved in the incarceration and care of vulnerable inmates;

    d.  As to Coker, failure to timely terminate abusive employees;

    e.  Failing to follow normal and accepted humane corrections practices and procedures relating to the safe care of vulnerable inmates;

    f.  Failing to provide care, supervision, and services necessary to maintain the physical and mental health of Plaintiff, including necessary treatment, supervision, monitoring and medical services, that a prudent person would consider essential for the well-being of a vulnerable adult;

113. As a direct and proximate result of Defendants' breach of duty to the Plaintiff, Plaintiff suffered severe physical injuries and emotional distress.

114. Defendants' acts and omissions as stated above constitute "abuse" as that

term is defined in § 415.102(1), Florida Statutes, as well as "neglect" as that

term is defined in § 415.102(15), Florida Statutes.

115. Pursuant to § 415.1111, Florida Statutes, Plaintiff is entitled to actual

damages from Defendant, as well as attorneys' fees and costs.

116. Plaintiffs will seek punitive damages provided for in the statute.

WHEREFORE, Plaintiff prays for judgment as noted below.

## **Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests of the Court:

A. Declaratory and Injunctive Relief to the extent of taking action to discontinue and prohibit ongoing threats and extraordinary treatment having the effect of chilling the exercise of privileged speech.

B. Reopening the flawed investigation of the attacks on Plaintiffs and the use of threats of retaliation to interfere with redress of abuses.

C. Disciplining officers who intimidated victims and witnesses to secure silence and officers who hid or destroyed evidence or information.

D. Awarding compensatory damages in an amount to be determined, including damages for physical injury permanent disability, disfigurement, and mental pain and suffering;

E. Punitive damages against the individual defendants for their reprehensible actions depriving both Plaintiffs of their rights;

F. Awarding nominal damages where other damages are unavailable;

G. Reasonable attorney's fees and costs under 42 U.S.C. § 1988;

H. Trial by jury on all counts so triable; and

I. Any further relief this Court deems just and proper.

Respectfully submitted,   _s/ James V. Cook_
JAMES V. COOK, ESQ.
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

ATTORNEY FOR PLAINTIFFS